# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERTO FERRER MIRANDA
ALVARADO; MADELEINE JANET
MORALES LOPEZ,
                    *Petitioners,*

            v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 03-70165

Agency Nos.
A72-136-241
A72-136-240

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
July 15, 2004—San Francisco, California
Submission Vacated November 4, 2004
Resubmitted June 14, 2005

Filed March 21, 2006
Amended June 2, 2006

Before: Betty B. Fletcher, Edward Leavy, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Leavy

5979

**COUNSEL**

Nadeem H. Makada, Burlingame, California, for the petitioner.

Thomas K. Ragland and Marshall Tamor Golding (on the brief), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

**ORDER**

The Opinion filed on March 21, 2006 and reported at 441 F.3d 750 (9th Cir. 2006), is hereby amended as follows:

1) Footnote 6, 441 F.3d at 759 n.6, is replaced in its entirety with the following:

The government has invoked only the *Chevron* deference doctrine. It has not contended here that "individual IJ decisions may be entitled to the lesser form of deference established under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the extent that such decisions possess 'those factors which give [the agency's interpretation] power to persuade, if lacking power to control.' *Id.* at 140." *Lin*, 416 F.3d at 191 (noting

but not deciding the question); *see also Zhang v. Gonzales*, 426 F.3d 540, 544 (2d Cir. 2005) ("An IJ's interpretation of ambiguous provisions of the INA is entitled no more deference than the inherent persuasiveness of the IJ's view commands."). Even assuming that *Skidmore* should be applied, we conclude that the IJ's brief and conclusory decision in this case, which referred to none of the relevant BIA or federal-court persecutor caselaw, does not adequately exhibit the requisite *Skidmore* factors — "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade," 323 U.S. at 140 — to warrant *Skidmore* deference. *Cf. Gao v. Gonzales*, 440 F.3d 62, 65 n.2 (2d Cir. 2006) ("[T]he present case does not require us to resolve [the *Skidmore* deference] issue because the *Skidmore* factors would not counsel deference to the particular IJ decision at issue.").

2) In Judge Leavy's concurrence, 441 F.3d at 767, the word "the" is deleted in the last sentence of the first paragraph, preceding "our interpretation of the applicable statutes."

With these amendments, the petition for rehearing en banc is denied. Judge Berzon voted to deny the petition for rehearing en banc and Judges B. Fletcher and Leavy so recommended. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

No further petitions for rehearing may be filed.

---

## OPINION

BERZON, Circuit Judge:

We apply a provision of the Immigration and Nationality

Act (INA) that forbids the granting of asylum and withholding of removal to individuals who participate in the persecution of others on a protected ground, even if they themselves have a well-founded fear of persecution should they return. Roberto Ferrer Miranda Alvarado ("Miranda") sought asylum and withholding of removal, but an Immigration Judge (IJ) held that Miranda was barred from relief because he had "assisted in the persecution of others . . . on account of their political opinion." *See* 8 U.S.C. §§ 1101(a)(42) (defining refugees to exclude "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion"), 1158(b)(2)(A)(i) (barring such persecutors from asylum), 1231(b)(3)(B)(i) (barring such persecutors from withholding of removal).[1] We hold that the IJ properly decided that Miranda "assisted in persecution" and is thus ineligible for asylum and withholding of removal.

## BACKGROUND

In 1981, Miranda, a native and citizen of Peru, joined the Peruvian Civil Guard in Lima. He was nineteen years old. His duties included protecting government officials and banks from attacks by guerrilla organizations. Because Miranda was a native speaker of Quechua as well as Spanish, he was also assigned to serve as a community leader in an impoverished Quechua-speaking neighborhood on the city's outskirts. In that role his tasks ranged from resolving land-use disputes to preventing infiltration by the guerrilla organization Sendero Luminoso ("Shining Path"). "Sendero Luminoso is a Maoist guerilla organization, founded around 1980, that opposes the current Peruvian government. Sendero Luminoso commits terrorist acts against both government officials and civilians."

---

[1]Madeleine Lopez, Miranda's wife, is derivatively included in Miranda's asylum application and was thus also barred. Where appropriate, we refer to the two petitioners collectively as "Miranda."

*Cruz-Navarro v. INS*, 232 F.3d 1024, 1027 n.4 (9th Cir. 2000). Miranda presented evidence — including evidence that Shining Path members shot another community leader and destroyed her body with explosives — indicating that as a community leader he faced substantial risks from the Shining Path.

Beginning in 1982, Miranda received orders to serve as an interpreter for other officers who interrogated suspected Shining Path members. During interrogations, suspects were often subjected to electric shock torture and beaten on the legs and feet with rubber batons. According to Miranda, "many times in a closed room with sand . . . electrical current was passed into their hands or feet," and the interrogees "shouted and gave expressions of pain." At his hearing, Miranda admitted witnessing these acts but denied personally executing them. He also maintained that he was unable to influence the torture: "I had no power to do anything about it. I wasn't able to do anything about it because that would have been against my superiors." Miranda stated that if he refused, "it would have affected [his] performance rating and [he] would not have been promoted." Miranda attempted formally to resign only in 1988, six years after the interrogations began. He did so assertedly "because I didn't want to belong anymore because I didn't like how the people doing the interrogations abused the Shining Path members," but on his resignation form he cited "family reasons."

Miranda carried out his translating duties two to three times a month for seven years. Asked how he felt watching the interrogations, Miranda replied:

> Very bad. I thought about all my family. . . . [I]f I had been able to do anything about it, I would have never let that happen. If there had been a different kind of authority, it wouldn't have happened. Because it was my orders from my superiors to go and do this work, I had no other alternative than to

go do it. . . . I had to go interpret because I had no other orders.

Miranda was asked if he was "ever able to tell anyone to stop the current or stop doing what they were doing." He answered:

Yes, because I'm a humanitarian and I feel the suffering of other people. And I was able to tell them don't put so much current on or don't put any more because sometimes they couldn't even speak. Yes, because the Quechua that they spoke, many times they couldn't even speak it after they were getting this current, so I would say please don't put any more. And they said to me you're just an interpreter. You shouldn't give your opinion here. You're supposed to just come and interpret what they are saying.

In 1989, Miranda requested and received "anti-terrorist and survival training." In the course of his training, he helped capture three Shining Path members who had attacked the training group. These guerrillas threatened Miranda and his companions, stating that "each of you will die; we never forget anyone." Upon returning home Miranda found that his wife and children had been visited by masked men who stole his police uniforms and painted or posted Shining Path slogans on the walls.

Miranda removed his family to a small city sixty miles to the south. He remained in Lima to carry out his police duties. He slept at the police station, returning to his Lima residence only every few days to take care of the family dog. In August 1990, Shining Path members again vandalized Miranda's property and killed his dog. They painted "we'll never forget you" on the walls and pinned a note to the corpse of his dog with a threat: "[Y]ou will die in the same way."

Miranda fled to the United States on August 26, 1990, and his wife followed in 1992. Miranda applied for asylum in June 1993. He stated in his asylum application that: "I have been directly targeted [by the Shining Path] because of my police work and anti-terrorist . . . training, and ideologies." His asylum application was referred to the Immigration Court because "[a]lthough the applicant has demonstrated a well-founded fear of persecution, he is barred from receiving asylum in the U.S. because he participated in the persecution of others."

The former Immigration and Nationalization Service (INS)[2] charged Miranda with being present in this country without being admitted or paroled. At the removal hearing, Miranda admitted the allegations and conceded removability, but requested asylum and withholding of removal. The IJ denied Miranda's application, concluding that:

> even if Mr. Miranda did not interrogate Shining Path detainees and apply electric shocks or beat them, he was a necessary part of the interrogation. Without his services as a Quechua interpreter, the interrogations could not proceed. With his services, they did proceed. Over six years, the respondent participated in such interrogations two to three times per month or approximately 144 to 216 times. He did not protest his role at any time despite his stated qualms and he did not seek to resign from police service until 1990, even assuming that his resignation application was motivated by the psychic wear and tear of his role in the interrogations or his disagreement with them.[3]

---

[2]On March 1, 2003, the INS ceased to exist and its functions were transferred to the newly-created Department of Homeland Security. *See Aguilera-Ruiz v. Ashcroft*, 348 F.3d 835, 835 n.* (9th Cir. 2003). For the sake of consistency, we refer to the INS in this opinion.

[3]The IJ's timeline is not precisely accurate, as Miranda testified that he attempted formally to resign in 1988 and then sought anti-terrorist train-

The IJ determined that Miranda had:

> assisted in the persecution of others, namely, Shining Path detainees, on account of their political opinion, that is, their membership in the highly ideological Shining Path. As to the detainees' political opinion, there is no indication in the record that the detainees were being interrogated for crimes or for reasons other than their connection with the Shining Path.

Miranda appealed to the BIA, asserting that under *Fedorenko v. United States*, 449 U.S. 490 (1981), the IJ used the wrong criteria to determine whether Miranda's translation services amounted to assistance in persecution. He also contended that he was an officer of the Civil Guard carrying out his duties in the midst of a civil war and, therefore, the alleged persecutory acts were not "on account of" the suspects' political opinions, but on account of their participation in an armed conflict. Under the agency's streamlining procedures, a BIA board member determined that Miranda's appeal did not merit consideration by a three-member panel and affirmed the results of the IJ's decision but not necessarily his reasoning. *See* 8 C.F.R. § 1003.1(e)(4); *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003).

# I

## *Chevron* Deference

When a case is streamlined, the BIA issues a form order indicating that "[t]he decision below is . . . the final agency determination." 8 C.F.R. § 1003.1(e)(4)(ii). We therefore review the IJ's opinion in this case. *Falcon Carriche*, 350

---

ing. Miranda does not argue that he was compelled to remain in the police force on account of factors other than duty, police regulations governing resignations, and career considerations.

F.3d at 849. The IJ's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

With respect to the IJ's legal determinations, the government argues that we must apply the deferential review prescribed in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* specifies that:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43 (footnotes omitted). *Chevron* deference, however, does not apply to all statutory interpretations issued by agencies; certain criteria, discussed below, must be met. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

**[1]** We have referred to the *Chevron* doctrine in the context of reviewing a statutory interpretation rendered by an IJ, rather than the BIA. We have not had occasion, however, to apply the second, deferential prong of *Chevron* where, as in this case, there is no statutory interpretation adopted by the BIA.

In *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813 (9th Cir. 2004), for example, we reviewed an IJ opinion that included an interpretation of the INA, which the BIA affirmed under the same streamlining procedure used here. *Id.* at 815. We noted that "of course, the usual *Chevron* rules apply" and summarized those rules, including a statement of when *Chevron* deference applies. *Id.* at 816 (footnote omitted). We proceeded to analyze the statutory question at issue, however, exclusively under prong one of *Chevron*, concluding that "Congress has spoken quite clearly." *Id.* at 819. We did not consider whether a single IJ's statutory interpretation is entitled to judicial deference as an agency interpretation. *See also Acosta v. Gonzales*, No. 04-72682, 2006 WL 408206, *1, *2 n.4 (9th Cir. Feb. 23, 2006) (reciting the *Chevron* framework before concluding that "an agency is not owed deference when the issue is the interpretation of Circuit law rather than the statute").

Similarly, while explaining the standard of review in *Zahedi v. INS*, 222 F.3d 1157 (9th Cir. 2000), we stated that "[w]e owe deference to legal decisions rendered by the BIA and IJ under the rubric of *Chevron*." *Id.* at 1162 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999)). *Zahedi* did not, however, address any statutory interpretation by the BIA *or* the IJ. Instead, it dealt only with the application of established legal concepts to the facts of the case. For that reason, and also because the BIA in *Zahedi* "adopted" the IJ's decision, *id.*, there was no reason to consider the degree of deference owed to IJs' statutory interpretations.

Here, as the government recognizes, the statute does not spell out what is meant by "assist[ing], or otherwise partici-pat[ing]" in the persecution of others. For that reason, the government's arguments supporting the denial of Miranda's petition for review hinge on the assertion that we must defer under prong two of *Chevron* to the IJ's interpretation of the pertinent statutory provisions as including Miranda's actions with regard to Shining Path members. We must therefore

determine whether an IJ's statutory interpretations are entitled to *Chevron* deference under the agency's streamlining regulation. We conclude that they are not.

**[2]** Recent Supreme Court case law has developed "the limits of *Chevron* deference owed to administrative practice in applying a statute." *Mead*, 533 U.S. at 226. Deference to administrative rulings is appropriate only if "the agency interpretation claiming deference was promulgated in the exercise of" congressionally-delegated authority "to make rules carrying the force of law." *Id.* at 226-27. Congress has generally delegated authority to the Attorney General to interpret immigration statutes, *see* 8 U.S.C. §§ 1103(a)(1), 1158(d)(5)(B), and, as we develop below, a considered, precedential statutory interpretation adopted by the Attorney General or his delegatee, the BIA, is entitled to *Chevron* deference as an interpretation that has "the force of law." An individual IJ's statutory interpretation, summarily affirmed by the BIA under the streamlining procedure, does not, however, result in a statutory interpretation that carries the "force of law."

*Mead* declined to apply *Chevron* deference when agency rulings had no "lawmaking pretense" and did not bind third parties. 533 U.S. at 233. Our cases applying *Mead* treat the precedential value of an agency action as *the* essential factor in determining whether *Chevron* deference is appropriate. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004) (denying *Chevron* deference when agency was "not acting with the force of law . . . , not acting in a way that would have precedential value for subsequent parties."); *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003) (en banc) (denying *Chevron* deference when agency action was "not an interpretation of a statute that will have the force of law generally for others in similar circumstances"); *Hall v. EPA*, 273 F.3d 1146, 1156 (9th Cir. 2001) ("Interpretations of the Act set forth in such non-precedential documents are not entitled to *Chevron* deference."). True to these principles, we have stated in the immi-

gration context that *Chevron* deference is appropriate when the BIA " 'intended to issue an interpretation' of a statute it enforces." *Lagandaon v. Ashcroft*, 383 F.3d 983, 987 (9th Cir. 2004) (citing *Hernandez v. Ashcroft*, 345 F.3d 824, 839 n.13 (9th Cir. 2003)).

**[3]** Where the BIA simply affirms the *results* of an IJ's decision without issuing its own opinion, let alone offering its own statutory analysis or indicating any intent to create precedent that will bind other IJs or itself, the *Mead* test is not met. After such an affirmance, another IJ could reach the opposite conclusion without violating any established agency position. The IJ's opinion is just that — the opinion of a single IJ, without precedential value and without the imprimatur of the Attorney General or the Attorney General's delegatee, the BIA. *See* 8 C.F.R. § 1003.1(d)(1) (delegating the Attorney General's statutory interpretation authority *only* to the BIA). Such an individual IJ's statutory interpretation is not precedential under the Attorney General's regulations. *See id.* §§ 103.3(c) (listing types of precedential decisions); 103.37(g) (same). Just as the tariff ruling in *Mead* was issued without notice and comment procedures, was not published, and could be modified without notice and comment, 533 U.S. at 223, an IJ's ruling is issued without the procedures required for a precedential BIA opinion, *see* 8 C.F.R. § 1003.1(g) (describing procedures), is not published, and could be contradicted by another IJ or by the BIA in a later opinion.

The sheer number of IJ decisions underscores our conclusion that they do not carry the force of law and are thus not entitled to *Chevron* deference. The Supreme Court has observed that: "Any suggestion that rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's 46 scattered offices is simply self-refuting." *Mead*, 533 U.S. at 233. The same rationale applies to IJ decisions. IJs working at 53 immigration courts located throughout the United States issue hundreds of thousands of decisions annually — more than 170,000 in 2002 alone. OFFICE

of Planning and Analysis, Executive Office of Immigration Review, U.S. Dep't of Justice, FY 2004: Statistical Year Book B1, D1, *available at* http://www.usdoj.gov/eoir/statspub/fy04syb.pdf (Mar. 2005). The same conclusion applies if we consider only those IJ decisions summarily affirmed by the BIA under the streamlining regulation. Those cases have numbered in the thousands *per month* since the streamlining regulation went into effect in 2002. *See* Comm. on Immigration Policy, Practice and Pro Bono, American Bar Association, Board of Immigration Appeals: Procedural Reforms to Improve Case Management, app. 24 (2003), *available at* http://www.dorsey.com/files/upload/DorseyStudyABA_8mgPDF.pdf.

In some circumstances, of course, we do apply *Chevron* deference to the legal interpretations of the INA by the Attorney General and his delegatees. In *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999), for instance, the Supreme Court applied *Chevron* deference where the BIA and the Attorney General explicitly adopted a particular statutory interpretation, *id.* at 424, and where the BIA, rather than an individual IJ, used its power granted by the Attorney General to "give[ ] ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *Id.* at 425 (internal quotation marks omitted). *See also Shivaraman v. Ashcroft*, 360 F.3d 1142, 1145 (9th Cir. 2004) ("We review de novo an agency's construction of a statute that it administers, subject to established principles of deference."); *Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir. 1995) (noting that "[t]he Board's purely legal interpretations of the Act are reviewed de novo, but are generally entitled to deference under *Chevron*").

Neither of those conditions is present when the BIA affirms an IJ's decision without opinion under the streamlining regulations. In such cases, the BIA does not explicitly adopt a statutory interpretation.[4] Indeed, we do not know on what

---

[4]There are cases in which an IJ's decision will simply apply BIA precedent that is subject to *Chevron* deference. *See, e.g., Damko v. INS*, 430

grounds the BIA decided the case, because its affirmance "approves the result reached in the decision below [, but] does not necessarily imply approval of all of the reasoning of that decision." 8 C.F.R. § 1003.1(e)(4)(ii). At the time relevant to this case, Congress delegated plenary authority to the Attorney General to enforce the INA. *See* 8 U.S.C. § 1103(a) (2000). The statute empowered the Attorney General to establish regulations to carry out that statutory delegation and granted him supervisory authority over INS employees. *Id.* § 1103(a)(2)-(3). Pursuant to those statutory powers, the Attorney General granted the BIA authority to issue precedential decisions binding on all IJs. *See* 8 C.F.R. § 1003.1(d)(1). Rather than exercise the BIA's power under 8 C.F.R. § 1003.1(d)(1), *cf. Aguirre-Aguirre* 526 U.S. at 425 (citing the regulatory antecedent of § 1003.1(d)(1), 8 C.F.R. § 3.1(d)(1) (1998)), however, a single BIA member deciding to streamline a case only exercises his or her power to decide if "[t]he issues on appeal are squarely controlled by existing" precedent or "are not so substantial that the case warrants the issuance of a written opinion." 8 C.F.R. § 1003.1(e)(4)(i).

---

F.3d 626, 634 n.13 (2d Cir. 2005) ("[T]he IJ did not engage in independent statutory construction, but rather relied on the BIA's prior construction of the INA to which we, in turn, accord deference."). In its thirteen lines of argument and three footnotes, the government's brief does not cite any agency decisions to which it asks us to defer. A subsequent precedential opinion by the Attorney General, *In re A-H-*, 23 I. & N. Dec. 774 (A.G. 2005), does discuss the persecutor bar here at issue. *A-H-*'s factual posture differs from the one before us, however, in that the Attorney General addressed the relief applications of "a self-proclaimed leader-in-exile of the Islamic Salvation Front of Algeria." *Id.* at 775. Accordingly, the focus of the Attorney General's analysis was on the proximity of a leader to persecutory acts. *A-H-* held that "[t]he plain meaning of the relevant words in the statute is broad enough to encompass aid and support provided by a political leader to those who carry out the goals of his group, including statements of incitement or encouragement and actions that result in advancing the violent activities of the group." *Id.* at 784. This precise holding of *A-H-* is not here relevant; the more general principles enunciated in *A-H* concern personal culpability overall and are fully consistent with our prior case law, as developed below.

Under these circumstances, an IJ decision, although presented as the final agency determination to be reviewed in federal court, is not legally relevant to any future decision-making, including by the very IJ who issued it. *See Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 190 (2d Cir. 2005) ("Absent the power to issue binding decisions, IJs cannot, themselves, be said to possess the requisite ability to issue, on behalf of the Attorney General, a 'rule' carrying the force of law — because one of the hallmarks of a legal 'rule' is that it will, in fact, apply equally in all cases of a similar kind.").[5] "[W]ere we to accord *Chevron* deference to non-binding IJ statutory interpretations, we could find ourselves in the impossible position of having to uphold as reasonable on Tuesday one construction that is completely antithetical to another construction we had affirmed as reasonable the Monday before. Such a scenario cannot be countenanced in a system of law." *Id.*; *see also id.* at 191 ("There is . . . no reason to believe that an IJ's summarily affirmed decision contains the sort of authoritative and considered statutory construction that *Chevron* deference was designed to honor.").

Given the features of the streamlining regime and its differences from the scheme given deference in *Aguirre-Aguirre*, we conclude that *Aguirre-Aguirre* does not control the question of *Chevron*'s applicability to a streamlined case. The Second Circuit has reached the same conclusion, noting that "we decline to extend *Chevron* deference to any statutory construction of the INA set forth in a summarily affirmed IJ opin-

---

[5]Inconsistent results can, however, implicate constitutional concerns. *See generally Njuguna v. Ashcroft*, 374 F.3d 765, 771 n.4 (9th Cir. 2004) ("The INS must give each asylum case individualized scrutiny, but it is a foundation of the rule of law that similarly situated individuals be treated similarly. . . . [W]e have previously noted inconsistent treatment of asylum applicants. *See Wang v. Ashcroft*, 341 F.3d 1015, 1019 n. 2 (9th Cir. 2003) (greeting with incredulity the INS's assertion that a reviewing court need not concern itself with the inconsistency [created] where the INS denied asylum to a woman subjected to coercive population control methods, but granted asylum to her husband on the basis of the woman's experience).").

ion." *Id.*; *see also Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005); *cf. Smriko v. Ashcroft*, 387 F.3d 279, 289 n.6 (3d Cir. 2004) ("[D]eferring to the reasoning of an IJ from which the BIA would be free to depart in other cases would seem highly problematic.").

[4] In sum, we hold that *Chevron* deference does not apply to an IJ's statutory interpretation summarily affirmed by the BIA.[6]

## II

## The Persecutor Exception

[5] Under the INA, any person who has "ordered, incited, assisted, or otherwise participated in" persecution of any person on account of a protected ground is ineligible for asylum and withholding of removal. 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *see also* 8 C.F.R.

---

[6]The government has invoked only the *Chevron* deference doctrine. It has not contended here that "individual IJ decisions may be entitled to the lesser form of deference established under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the extent that such decisions possess 'those factors which give [the agency's interpretation] power to persuade, if lacking power to control.' *Id.* at 140." *Lin*, 416 F.3d at 191 (noting but not deciding the question); *see also Zhang v. Gonzales*, 426 F.3d 540, 544 (2d Cir. 2005) ("An IJ's interpretation of ambiguous provisions of the INA is entitled no more deference than the inherent persuasiveness of the IJ's view commands."). Even assuming that *Skidmore* should be applied, we conclude that the IJ's brief and conclusory decision in this case, which referred to none of the relevant BIA or federal-court persecutor caselaw, does not adequately exhibit the requisite *Skidmore* factors — "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade," 323 U.S. at 140 — to warrant *Skidmore* deference. *Cf. Gao v. Gonzales*, 440 F.3d 62, 65 n.2 (2d Cir. 2006) ("[T]he present case does not require us to resolve [the *Skidmore* deference] issue because the *Skidmore* factors would not counsel deference to the particular IJ decision at issue.").

§ 208.13(c)(2)(i)(E) (mandatory denials).[7] The INA does not define "persecution," but our case law defines it as "the infliction of suffering or harm upon those who differ . . . in a way regarded as offensive." *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc) (internal quotation marks and citation omitted). Miranda challenges the denial of relief in his case on two separate grounds: First, he argues that the IJ used the wrong criteria to determine whether his role as a translator during interrogations in which detainees were tortured constitutes assistance in persecution. Second, he argues that even if his translation work does amount to assistance, the persecution was not on account of political opinion. We address each argument in turn.

## A.    Assistance in persecution

In the opinions that interpret and give shape to the persecution-of-others exceptions under the INA, this court and other circuit courts have turned for guidance to a Supreme Court ruling interpreting a similarly-worded statute passed at the close of World War II. *See Fedorenko v. United States*, 449 U.S. 490 (1981). *Fedorenko* involved denaturalization, not asylum proceedings. Fedorenko had been granted displaced person status after World War II. It was later discovered that, while serving as a Russian soldier in 1941, Fedorenko was captured by Germany and subsequently worked as a prison guard at Treblinka, a Nazi death camp in Poland. The government sought to strip him of citizenship and expel him, relying on the persecutor exception to refugee status for "individuals who had 'assisted the enemy in persecuting [civilians]' " contained in the Displaced Persons Act of 1948 (DPA), Pub. L. No. 80-774, 62 Stat. 1009 (1948).

*Fedorenko* held that, under the terms of the DPA the *kind*

---

[7]Deferral of removal under the Convention Against Torture (CAT) is not so precluded. *See, e.g.*, *Singh v. Gonzales*, 417 F.3d 736, 738 n.1 (7th Cir. 2005). Miranda, however, has not applied for CAT relief.

of acts Fedorenko perpetrated were central to its analysis. *See* 449 U.S. at 512 n.34 ("focusing on whether particular conduct can be considered assisting in the *persecution* of civilians"). In a somewhat cryptic footnote that has since become the principal guide to interpreting persecutor exceptions generally, *see, e.g.*, *Singh v. Gonzales*, 417 F.3d 736 (7th Cir. 2005), the Court stated:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

449 U.S. at 512 n.34. *Fedorenko* thus indicated a continuum of conduct against which an individual's actions must be evaluated so as to determine personal culpability.

Applying *Fedorenko* to the same statutory language here at issue, we recently considered the persecutor exception to the asylum and withholding of removal provisions. *Vukmirovic v. Ashcroft*, 362 F.3d 1247 (9th Cir. 2004), held that an IJ failed to conduct a sufficiently particularized evaluation to determine the petitioner's responsibility for persecution committed by other Bosnian Serbs. *Id.* at 1252. We emphasized two requirements for establishing culpability under the persecutor exception. First, relying on *Laipenieks v. INS*, 750 F.2d 1427 (9th Cir. 1985), which considered similar statutory language, we stated that "individual accountability must be established."

*Vukmirovic*, 362 F.3d at 1252.[8] We went on, secondly, to evaluate the surrounding circumstances, including whether the alleged persecutor was acting in self-defense, to determine whether the applicant had assisted or otherwise participated in persecution. *Id.* at 1252-53. Vukmirovic's petition for review was granted because we determined that he did act in self-defense and that, accordingly, his acts harmful to Croats did not constitute persecution. *Id.* at 1253.

Also informative is *Hernandez v. Reno*, 258 F.3d 806 (8th Cir. 2001), which concerned a Guatemalan man forcibly recruited by guerrillas and ordered, under pain of death, to shoot at peasants. *Hernandez* held that "[u]nder *Fedorenko*, a court faced with difficult 'line-drawing problems' should engage in a particularized evaluation in order to determine whether an individual's behavior was culpable to such a degree that he could be fairly deemed to have assisted or participated in persecution." *Id.* at 813; *see also Vukmirovic*, 362 F.3d at 1252 (quoting from this passage and "agree[ing] with the Eighth Circuit"); *cf. In re A-H-*, 23 I. & N. Dec. 774, 785 (A.G. 2005) (citing *Hernandez* with approval for the proposition that "[i]t is appropriate to look at the totality of the relevant conduct in determining whether the bar to eligibility applies.").[9] As in *Fedorenko*, the length of time over which

_____

[8]*Laipenieks* addressed former 8 U.S.C. § 1251(a)(19) and held that the "ordered, incited, assisted, or otherwise participated in the persecution of any person" standard "requires that . . . the evidence establish[ ] that the individual in question *personally* ordered, incited, assisted, or otherwise participated in the persecution of individuals." 750 F.2d at 1431 (emphasis added); *see also id.* at 1431-32 ("[A]ctive personal involvement in persecutorial acts needs to be demonstrated . . . . [P]roof of personal active assistance or participation in persecutorial acts [is required].").

[9]The Eighth Circuit observed that:

The facts here are very different from those in *Fedorenko*. Although Fedorenko was free to leave Treblinka from time to time, he never tried to escape. Hernandez was never given any leave, and he escaped at his first opportunity. Fedorenko served at Treblinka for over a year, but Hernandez spent only 20 days

the person was involved in the acts, the kind of threats used to compel assistance, and the efforts undertaken to escape (or the lack thereof in Fedorenko's case) were all significant, according to the *Hernandez* court, in weighing individual culpability. *Id.* at 813-14. *But cf. Bah v. Ashcroft*, 341 F.3d 348, 351 (5th Cir. 2003) (per curiam) (holding that "the alien's personal motivation is not relevant" where Bah joined an insurgent group in Sierra Leone under threat of death and three times attempted to escape).[10]

---

> as a prisoner of ORPA. Unlike Fedorenko, Hernandez never received any payment or reward from ORPA. Hernandez risked his life by articulating his disagreement with ORPA's violent tactics, by disobeying his commander's orders to shoot directly at the villagers, and by fleeing from his captors into Mexico. While Fedorenko and his fellow Ukranians far outnumbered the Germans at Treblinka, Hernandez and two other forced recruits were isolated within a group of fifty guerrillas. And significantly, Hernandez himself revealed his involvement with ORPA to United States officials whereas Fedorenko omitted important information on his entry documents and covered up his connection with Treblinka.

*Hernandez*, 258 F.3d at 814.

[10]Aside from *Bah*, courts interpreting the relevant INA provisions have used caution in applying *Fedorenko*'s reading of the similarly-worded DPA to mean that "an individual's service as a concentration camp armed guard — *whether voluntary or involuntary* — ma[kes] him ineligible [for relief]." 449 U.S. at 512 (emphasis added). *See Xie v. INS*, 434 F.3d 136, 141, 144 (2d Cir. 2006) (concluding that "we find it unlikely that the phrase 'assisted in persecution' implicitly includes a voluntariness requirement in one statute but not the other" but assessing the petitioner's voluntariness nonetheless and "emphatically" leaving open the possibility that redemptive behavior may be relevant to "whether an applicant has assisted in persecution"); *Hernandez*, 258 F.3d at 814 (faulting the BIA for failing to "consider Hernandez's uncontroverted testimony that his involvement with ORPA was at all times involuntary and compelled by threats of death and that he shared no persecutory motives with the guerrillas"). As will appear, this case does not require us to decide whether even actions that result from direct, immediate, and extreme "physical[ ] or psychological[ ]" compulsion, *see Xie*, 434 F.3d at 143, or are accompanied by frequent redemptive behavior such as fostering escape attempts, can be sufficiently culpable to preclude asylum and withholding of removal eligibility.

**[6]** Thus, determining whether a petitioner "assisted in persecution" requires a particularized evaluation of both personal involvement and purposeful assistance in order to ascertain culpability. *See Vukmirovic*, 362 F.3d at 1252; *Hernandez*, 258 F.3d at 813. This standard does not require actual "trigger-pulling," *see In re A-H-*, 23 I. & N. Dec. at 784 (stating that the persecutor bar "do[es] not require direct personal involvement in the *acts* of persecution" (emphasis added)), but "[m]ere acquiescence or membership in an organization," is insufficient to satisfy the persecutor exception. *See Vukmirovic*, 362 F.3d at 1252 (internal quotation marks omitted); *see also Kalubi v. Ashcroft*, 364 F.3d 1134, 1139 (9th Cir. 2004); *Matter of Rodriguez-Majano*, 19 I. & N. Dec. 811, 814-15 (BIA 1988) ("[M]ere membership in an organization, even one which engages in persecution, is not sufficient to bar one from relief, but only [*sic*] if one's action or inaction furthers that persecution in some way.").[11] Although such mem-

---

[11]*Laipenieks*, which emphasized the need for precision along this range of personal involvement, has on occasion been read to require a persecutor *personally* to inflict injury, rather than to behave in some capacity that made it possible for others to engage in brutal acts. *See, e.g*, *United States v. Reimer*, 356 F.3d 456, 462 n.6 (2d Cir. 2004) (collecting cases on the two sides of this supposed divide); *Hammer v. INS*, 195 F.3d 836, 844 (6th Cir. 1999) ("To the extent that those cases [including *Laipenieks*] would require the government to prove the alien's personal participation or active assistance in specific acts of brutality . . . we decline to follow them."); *Schellong v. INS*, 805 F.2d 655, 661 (7th Cir. 1986) ("Insofar as these cases [including *Laipenieks*] hold that personal involvement in atrocities is necessary to have assisted in persecution . . . they conflict with *Fedorenko*."). In *Hammer*, "[t]he BIA found that [the petitioner] served willingly as an armed SS concentration camp guard," 195 F.3d at 844, and in *Schellong* the petitioner did "not dispute that he served as a concentration camp guard at Sachsenburg and trained and supervised guards at Dachau." 805 F.2d at 661; *see also Kulle v. INS*, 825 F.2d 1188, 1192 (7th Cir. 1987) (indicating that the petitioner was armed although "Kulle insists he did not have authority to shoot prisoners attempting escape"). The principle *Laipenieks* established with respect to personal involvement in persecution, however, was simply that *Fedorenko*, the statutory language, and its legislative history require more than "[m]ere acquiescence or membership in a [persecutory] organization." 750 F.2d at 1431-32. Beyond that,

bership could signal support for the persecutorial aims of others, it does not suffice, standing alone, to establish the requisite personal assistance or participation in persecutorial acts.

[7] This most basic requirement of personal involvement is met here. Miranda's actions went beyond mere membership, as he was undisputedly a regular part of interrogation teams who questioned Shining Path members. He was present and active during the alleged persecution. *See Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006) (distinguishing between active and passive conduct).

*Fedorenko*'s "continuum of conduct" footnote guides us in the next step of the analysis. Whether Miranda's assistance was material is measured by examining the degree of relation his acts had to the persecution itself: How instrumental to the persecutory end were those acts? Did the acts further the persecution, or were they tangential to it? Cutting the hair of a death camp prisoner bound for execution is a ghastly act. Nevertheless, the hair cutting was in no way essential to the ensuing execution, or even in furtherance of it; nor would cutting the hair of prisoners legitimately confined amount to persecution, standing alone. Thus, the hair cutters did not "assist or otherwise participate in" persecution.

On the other hand, the camp guard who personally shoots at escapees participates directly in a persecutory act: Had he not shot, that particular act would not have happened. More to the present point, guards are essential to the orderly functioning of death camps, even when they do not shoot anyone. The continuum, as these examples show and as the Court in

---

*Laipenieks* made a fact-specific determination that "the government's evidence failed to establish deportability," *id.* at 1437, and did not impose a rule that personal infliction of harm is necessary to establish assistance or participation in persecution directly perpetrated by others. Nothing in *Laipenieks*, consequently, is inconsistent with the results reached in cases such as *Hammer*, *Schellong*, and *Kulle*.

*Fedorenko* noted, is not an exact or absolute one; difficult line-drawing questions will always persist.

[8] In this case, the IJ stated that Miranda "was a necessary part of the interrogation. Without his services as a Quechua interpreter, the interrogations could not proceed. With his services, they did proceed." Though conclusory, the IJ's analysis goes to the heart of the *Fedorenko* continuum: Miranda was not just engaged in acts peripheral to persecution. Rather, he performed an integral role in facilitating the persecution. In his role as interpreter, Miranda materially aided the persecution process, by translating the questions and answers that were interspersed with electric shock torture. Without the translation, there would have been no reason for the torture to occur as it did, as its point was to elicit information. Thus, Miranda was not simply a bystander with regard to the direct acts of persecution. His assistance and participation were in furtherance of the particular form of persecution that occurred. *See id.* (distinguishing between conduct that "had direct consequences for the victims" and conduct that "was tangential to the acts of oppression").

Moreover, Miranda makes no colorable claim that his actions were motivated by self-defense or similar extenuating circumstances, as in *Vukmirovic*. The IJ properly focused on the frequency and length of time that Miranda worked as a translator, finding that Miranda translated in interrogations where torture took place for six to seven years, two to three times per month. The IJ also considered that Miranda did not seek to resign for six years, and that there is no evidence in the record that dire physical consequences — as distinct from economic and career consequences — would have resulted from simply refusing to continue in the Civil Guard. *See id.* ("[N]othing in the record indicates that Xie did not have the ability to quit his job as a driver at any time in order to avoid the persecution of women that was part of that job. His reason for not doing so appears to have been the loss of wages he would incur. Xie has never suggested that he was physically

or psychologically coerced into working for the county as a driver." (citation omitted)); *Singh*, 417 F.3d at 740 (emphasizing "the repetition of the conduct over an extended period" and noting that during Singh's "lengthy term of employment, he refused to quit the police force due to his need for a steady paycheck and his apparent desire to avoid searching for work with a different employer"). The IJ noted that Miranda had qualms about his participation in the interrogations, and that he at times urged the torturers to lessen the amount of electric current applied. But Miranda did so, by his own account, only when the torture became so extreme that it became difficult for the victims to speak. Moreover, Miranda made little effort to avoid assisting in the interrogations. *Cf. Ofosu v. McElroy*, 98 F.3d 694, 701 (2d Cir. 1996) (commenting that potentially relevant factors are whether a petitioner "rejected the repressive activities in which he was involved, or put himself at risk in order to protect those who were persecuted"); *see also Xie*, 434 F.3d at 144 ("[U]nlike Ofosu, Xie offered no evidence that he was unaware of the repressive nature of the duties he undertook as part of his voluntary employment. Xie assisted in persecution until there were favorable circumstances for him to cease doing so."). Consequently, were we to assume that, as *Hernandez* posits, there are, after *Fedorenko*, some extreme situations so coercive that, on a totality of circumstances analysis, an individual cannot be said to have "assisted or otherwise participated in" persecution he was forced to inflict, we would conclude that this case does not present such an extraordinary situation.

[9] The record before us presents a case perhaps at the margin of the culpability required under the statute. Miranda was not in a position of authority with regard to planning or inciting the interrogations; he did not directly apply the electric shocks or beatings; he did not supply the physical compulsion that allowed the torture to occur, as do armed guards; and he did not, forcibly or otherwise, arrest the victims or bring them to the place of torture. Nonetheless, as the IJ found, his services were integral to the particular form of persecution that

occurred. We conclude that the IJ's determination that the necessary elements of Miranda's personal assistance in acts that furthered the persecution of others have been established is supported by substantial evidence. Miranda materially assisted the persecution of suspected Shining Path members and has presented no legally cognizable justification for his complicity.

## B.    On account of political opinion

As the IJ applied the correct, established legal standards with regard to this second issue of nexus between the persecution and a protected ground by inquiring into whether "the detainees were being interrogated for crimes or for reasons other than their connection with the [highly ideological] Shining Path," we proceed to review his factual findings for substantial evidence. *See Mohammed v. Gonzales*, 400 F.3d 785, 791 (9th Cir. 2005).

Evidence presented to the IJ indicated that Miranda assisted in the persecution of others on account of their political opinion. Specifically, Miranda testified that those interrogated and tortured were members or suspected members of the Shining Path; that "interrogation" was different from questioning a possible suspect; that "[i]nterrogating is asking people where is a certain group, what do they do, investigating their bases, finding out who their boss is, where he lives, who he lives with;" and that of those interrogated "[a]ll of them were only Shining Path."[12] Because these statements were sufficient to raise the inference that individuals were selected for interrogation on the basis of their affiliation or suspected affiliation with an opposition group, not because they themselves were suspected of criminal activity, the burden of proof became Miranda's to show by a preponderance of the evidence that the persecution was not on account of political opinion. *See*

---

[12]The last statement was made in reply to the question "How many of those interrogations were interrogations of suspected terrorists?"

8 C.F.R. §§ 208.13(c)(2)(ii) (stating with respect to asylum that: "If the evidence indicates that one of the above grounds apply [*sic*] to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act."); 208.16(d)(2) ("If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

Our case law suggests at least two ways Miranda could have met his burden of disproving that he assisted in the persecution of others on account of their political opinion. First, Miranda could have presented evidence that these interrogations were part of legitimate criminal prosecutions. By "legitimate," our case law refers to a prosecution that was not tainted, *even in part*, by impermissible motives corresponding to grounds protected under the INA. *See Borja v. INS*, 175 F.3d 732, 736 (9th Cir. 1999) (en banc) (holding that persecution is on account of a protected ground if it is "motivated, at least in part, by an actual or implied protected ground" (internal quotation marks and citation omitted)).

**[10]** We conclude that substantial evidence supports the IJ's determination that "there is no indication in the record that the detainees were being interrogated for crimes or for reasons other than their connection with the Shining Path." Miranda did not establish that being a member of the Shining Path was a criminal offense in Peru, or that these actual or suspected members were under investigation for carrying out specific terrorist acts or were subsequently prosecuted for their crimes. We have repeatedly held that persecution "in the absence of any legitimate criminal prosecution, conducted at least in part on account of political opinion" constitutes persecution on account of political opinion, even if the persecution served intelligence-gathering purposes. *See Ratnam v. INS*, 154 F.3d 990, 996 (9th Cir. 1998); *see also Ndom v. Ashcroft*, 384 F.3d 743, 755 (9th Cir. 2004); *Blanco-Lopez v. INS*, 858

F.2d 531, 534 (9th Cir. 1988). Miranda's law enforcement contention therefore fails.

[11] The second way Miranda attempts to disprove his assistance of persecution on account of political opinion is to argue that the interrogations and torture were part of generalized civil discord, rather than politically-motivated persecution. *Cf. Rostomian v. INS*, 210 F.3d 1088, 1089 (9th Cir. 2000) ("[Petitioners] did not establish that the attack was anything more than an act of random violence during a period of significant strife."). The BIA in *Matter of Fuentes*, 19 I. & N. Dec. 658 (BIA 1988), held that the dangers faced by a Salvadoran policeman from guerrillas during that country's political struggles did not constitute persecution on account of political opinion: "Such dangers are perils arising from the nature of their employment and domestic unrest rather than 'on account of' immutable characteristics or beliefs within the scope of sections 101(a)(42)(A) or 243(h) of the [INA]." *Id.* at 661; *see also Cruz-Navarro*, 232 F.3d at 1028-29. The converse is also true: Dangers faced by those associated with or suspected of being associated with an armed group ideologically opposed to the government may reflect the general unrest precipitated by the conflict rather than persecution premised on political opinion. *See Rodriguez-Majano*, 19 I. & N. Dec. at 815-16 ("In analyzing a claim of persecution in the context of a civil war, one must examine the motivation of the group threatening harm . . . . Harm resulting from generalized civil strife is not persecution. *Martinez-Romero v. INS*, 692 F.2d 595 (9th Cir. 1982) . . . . [T]hose who inflict such harm are not engaging in persecution."). Thus, injury inflicted by opposing political or other groups on each other during a civil conflict will not necessarily equate to persecution on account of one of the INA's protected grounds.

[12] At the same time, "wide-spread violence and detention cannot override record evidence that persecution occurred at least in part as a result of an applicant's protected status." *Ndom*, 384 F.3d at 752. Our asylum cases have therefore not

hesitated to impute motivation on account of political opinion in factually-compelling circumstances where someone fighting on one side of a politically-based civil war persecutes someone affiliated with the group fighting on the other side. *See, e.g.*, *Briones v. INS*, 175 F.3d 727, 729 (9th Cir. 1999) (en banc) ("Briones's activity as a confidential informer who sided with the Phillipine military in a conflict that was political at its core certainly would be perceived as a political act by the group informed upon."); *Gomez-Saballos v. INS*, 79 F.3d 912, 917 (9th Cir. 1996) ("To those imprisoned, [the petitioner] clearly represented the person in charge of their political incarceration. The prisoners represented an organized political force in opposition to the political views of the Sandinistas. The death threats to him by those imprisoned cannot be separated from his political position and the obvious perception to the prisoners that, as the person in charge of their custody, he adhered to political beliefs in opposition to their own."). *Vukmirovic* emphasized that it is untenable to impose a blanket exclusion on asylum-seekers who come from places beset by civil war and are affiliated in some respect with one side or the other in the conflict: "[T]he BIA itself noted in *In re Rodriguez-Majano*, 19 I. & N. Dec. 811 (BIA 1988), [that] under such an expansive interpretation, 'members of armed opposition groups throughout the world would be barred from seeking haven in this country.' *Id.* at 816." 362 F.3d at 1253. Conversely, an asylum-seeker is not insulated from application of the persecutor exception *simply* because his acts sought to further the interests of one side of a civil conflict. The connection between that conflict and the asserted persecution must be analyzed carefully.

**[13]** On this record, Miranda has not established that the particular persecution in which he was involved — interrogations involving torture — was in direct opposition to *acts* of terrorism or civil strife. As explained by the BIA in *Rodriguez-Majano*, "harm which may result *incidentally* from behavior directed at another goal, the overthrow of a government or, alternatively, the defense of that government against

an opponent, is not persecution . . . . We would include in this list [ ] engaging in military actions, the attacking of garrisons, the burning of cars, and the destruction of other property as actions outside the limits of the term 'persecution.' " 19 I. & N. Dec. at 815 (emphasis added)). Unlike the sort of on-the-battlefield conflict discussed in *Rodriguez-Majano*, torturing individuals selected for their affiliation with an opposition group is not inherent in armed conflict,[13] any more than is "ethnic cleansing." *Cf. Knezevic v. Ashcroft*, 367 F.3d 1206, 1211-12 (9th Cir. 2004) (explaining that the IJ "miss[ed] the critical distinction between persons displaced by the inevitable ravages of war . . . and those fleeing from hostile forces motivated by a desire to kill each and every member of that group."). Where, as the record indicates happened here, individuals are singled out at least in part for their political affiliation, rather than for their own actions; detained and thereby removed from active participation in civil strife; and tortured to obtain information about the opposition group, the surrounding civil strife does not undermine the conclusion that the torture is persecution on account of political opinion. *See Ndom*, 384 F.3d at 755; *Ratnam*, 154 F.3d at 996.

---

[13]Miranda argues that "[i]n the same way that this country has detained and interrogated suspected Al Quaeda sympathizers, Peru could not afford to allow Shining Path members to go free irrespective of the fact that there were no particularized charges of crimes." This contention begs the question of the persecution at issue, as it avoids addressing the torture Miranda assisted. Miranda does not advance the argument that torture becomes lawful in warfare or civil conflict, and there is voluminous authority to the contrary, notably the Convention Against Torture itself, which Peru signed in 1985 and ratified in 1988. *See* Office of the United Nations High Comm'r for Human Rights, *Status of ratification of the Convention against Torture* (Nov. 2, 2004), *available at* http://www.ohchr.org/english/law/cat-ratify.htm. The Convention's part 1, article 2 states in relevant part: "No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, pt. 1, art. 2, 1465 U.N.T.S. 85, *available at* http://www.unhchr.ch/html/menu3/b/h_cat39.htm.

**[14]** In sum, while the record makes clear that the Shining Path was a terrorist organization, Miranda's testimony does not demonstrate that the particular Shining Path adherents who were interrogated and tortured were criminal suspects or armed guerrillas actively engaged in military activity, rather than individuals known to sympathize with the Shining Path's political goals. Substantial evidence therefore supports the IJ's determination that Miranda did not meet his burden of establishing that he did not assist in persecution of others on account of their political opinion.

## Conclusion

For the reasons given, Miranda's services as an interpreter amounted to assistance in persecution. His acts were material to the interrogations and their accompanying torture, and his assistance was personally culpable — that is, engaged in for reasons other than direct self-defense and unaccompanied by meaningful attempts at noncompliance or escape. Together, these elements establish that Miranda is covered by the persecutor exception. As Miranda did not rebut, by a preponderance of the evidence, the indication that his persecution of suspected Shining Path members was on account of political opinion, we deny the petition for review.

**PETITION FOR REVIEW DENIED.**

---

LEAVY, Circuit Judge, concurring:

I concur in Part II of the opinion. In this relatively straight-forward case, the IJ determined that Miranda had "assisted in the persecution of others . . . on account of their political opinion" under 8 U.S.C. § 1101(a)(42), and was thus ineligible for asylum and withholding of removal under 8 U.S.C. §§ 1158(b)(2)(A)(i) and 1231 (b)(3)(B)(i). The BIA "streamlined" the case, affirming the result without an opinion. In

such a case, we review the IJ's factual determinations for substantial evidence and we review de novo the IJ's legal conclusions. *Reyes-Reyes v. Ashcroft*, 384 F.3d 782, 786 (9th Cir. 2004). I concur in the holding that substantial evidence supports the IJ's factual determination that Miranda persecuted others on account of their political opinion under our interpretation of the applicable statutes.

The discussion in Part I regarding *Chevron* deference is irrelevant to the outcome of this case. Whether we defer or not to the IJ's legal conclusion has no effect on the outcome for Miranda — either way, he does not prevail. We should reserve the discussion on *Chevron* deference to a case where the resolution of this issue is necessary to the decision.