**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARTURO ORTEGA-CERVANTES,
                    *Petitioner,*

           v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 05-70605

Agency No.
A79-783-189

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 19, 2007—San Francisco, California

Filed September 4, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Stephen S. Trott and William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Gloria Martinez-Senftner, Roseville, California, for the petitioner.

Arthur L. Rabin, Stephen J. Flynn, U.S. Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

---

**OPINION**

W. FLETCHER, Circuit Judge:

This case requires us to determine whether aliens who are "conditional[ly] parole[d]" pursuant to 8 U.S.C. § 1226(a) are necessarily "paroled into the United States" and thus eligible for adjustment of status pursuant to 8 U.S.C. § 1255(a). We hold that they are not.

## I.  Background

Arturo Ortega-Cervantes, a citizen of Mexico, was apprehended on June 8, 2002, together with fourteen other aliens who had been smuggled into the United States. In a Notice to Appear issued and served the following day, the Immigration and Naturalization Service ("INS") charged Ortega-Cervantes with being removable from the United States as an unlawful entrant. *See* 8 U.S.C. § 1182(a)(6)(A)(i). However, in order to secure his testimony in the criminal prosecution of his smuggler, the INS conditionally released Ortega-Cervantes from INS detention on June 20, 2002.

The terms of Ortega-Cervantes's June 20 release were set out in INS Form I-220A, "Order of Release on Recognizance." The form stated that Ortega-Cervantes had been "arrested and placed in removal proceedings" but was being released "[i]n accordance with section 236 of the Immigration and Nationality Act [8 U.S.C. § 1226] and applicable provisions of Title 8 of the Code of Federal Regulations." Among the conditions imposed on Ortega-Cervantes was a requirement that he report to the INS "[a]t the conclusion of the

criminal proceedings in which [he was to be] a witness . . . for further review of [his] case." The INS did not issue Ortega-Cervantes an I-94 card, which is the document typically provided to aliens "parole[d] into the United States" pursuant to 8 U.S.C. § 1182(d)(5)(A).

A few days after his June 20 release, Ortega-Cervantes married a U.S. citizen. He then applied for a visa based on his marriage and sought to adjust his status to that of a lawful permanent resident pursuant to 8 U.S.C. § 1255(a), which applies only to aliens who have been "inspected and admitted or paroled into the United States."

As it turned out, Ortega-Cervantes was never called upon to testify against his smuggler. On August 28, 2002, he reported as required to the INS. He was briefly taken into custody and then released on $5,000 bond "pending a final decision in [his] exclusion/deportation hearing."

On December 20, 2002, Ortega-Cervantes appeared before an immigration judge ("IJ") and conceded removability. He claimed, however, that he was eligible for adjustment of status because, despite not having been "admitted or paroled after inspection on June 8, 2002," "he was subsequently admitted on June 20, 2002 as a federal witness on behalf of the Department of Justice."

In a written decision issued on May 22, 2003, and in an oral decision delivered on June 24, 2003, the IJ concluded that Ortega-Cervantes was not eligible for adjustment of status because he had not been "paroled into the United States" at any point. According to the IJ, "a person given 'conditional parole' under [8 U.S.C. § 1226(a)] is not a person who has been 'paroled into the United States' under [8 U.S.C. § 1255]."

Ortega-Cervantes appealed to the BIA. He relied in part on a 1999 INS policy memorandum indicating that aliens

released pursuant to § 1226(a) may apply for adjustment of status. On January 6, 2005, the BIA issued a single-member decision affirming the IJ. The BIA explained that the policy memorandum did "not have the force and effect of law" and, in any event, that the memorandum did not indicate "that an alien granted conditional parole should be considered 'paroled' for the purpose of adjustment of status." Ortega-Cervantes filed a timely petition for review.

## II.    Jurisdiction and Standard of Review

Although we lack jurisdiction to review a discretionary denial of adjustment of status, *see* 8 U.S.C. § 1252(a)(2)(B)(i); *Hosseini v. Gonzales*, 471 F.3d 953, 956-57 (9th Cir. 2006) (as amended), we retain jurisdiction to decide, as a matter of law, whether an alien is statutorily eligible for adjustment of status. *See* 8 U.S.C. § 1252(a)(2)(D); *Freeman v. Gonzales*, 444 F.3d 1031, 1037 (9th Cir. 2006). It is the legal question of eligibility that is at issue here.

We review the BIA's legal conclusions de novo, "except to the extent that deference is owed to its interpretation of the governing statutes and regulations." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011 (9th Cir. 2006). The government contends that the BIA's interpretation of the parole provisions at issue in this case is entitled to *Chevron* deference. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984). We disagree. "[B]ecause the BIA's decision was an unpublished disposition, issued by a single member of the BIA, which does not bind third parties," we employ the less deferential *Skidmore* standard. *Garcia-Quintero*, 455 F.3d at 1012, 1014 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Kharana v. Gonzales*, 487 F.3d 1280, 1283 n.4 (9th Cir. 2007); *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 920-24 (9th Cir. 2006) (as amended). Under *Skidmore*, the deference we afford to an agency's judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its con-

sistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

## III. Discussion

Adjustment of status provides a means for certain aliens present in the United States to become lawful permanent residents. Under 8 U.S.C. § 1255(a), adjustment of status is available only to aliens who were "inspected and admitted or paroled into the United States." That statute provides:

> The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a). Aliens who "entered the United States without inspection" are not entitled to adjust their status unless they filed either a petition for classification or an application for a labor certification before April 30, 2001, and, if the petition or application was filed after January 14, 1998, they also were "physically present in the United States on December 21, 2000." *Id*. § 1255(i)(1). Ortega-Cervantes concedes that he was not "admitted" within the meaning of § 1255(a) and does not satisfy the date prerequisites of § 1255(i). He now insists, however, that he is eligible to adjust his status because he was "paroled into the United States" within the meaning of § 1255(a) on June 20, 2002.

Two provisions of the immigration laws authorize the parole of aliens. Only one of those provisions, 8 U.S.C.

§ 1182(d)(5)(A), specifically refers to "parole into the United States":

> The Attorney General may . . . in his discretion *parole into the United States* temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A) (emphasis added); *see also* 8 C.F.R. § 212.5. It is undisputed that aliens "paroled into the United States" pursuant to § 1182(d)(5)(A) are aliens "paroled into the United States" for purposes of adjustment of status under § 1255(a).

The second parole provision, 8 U.S.C. § 1226(a), provides for the "conditional parole" of aliens who are detained pending a final removal decision:

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—
>
> > (1) may continue to detain the arrested alien; and

(2) may release the alien on—

    (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

    (B) *conditional parole*; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

8 U.S.C. § 1226(a) (emphasis added).

Ortega-Cervantes advances two arguments. First, he contends that he was paroled into the United States under the authority of § 1182(d)(5)(A) rather than conditionally paroled under the authority of § 1226(a). If Ortega-Cervantes was paroled into the United States pursuant to § 1182(d)(5)(A), he is eligible for adjustment of status under § 1255(a), and our inquiry is at an end. Second, Ortega-Cervantes contends that if he was conditionally paroled under the authority of § 1226(a), that parole constitutes a parole into the United States for purposes of adjustment of status under § 1255(a). Whether conditional parolees under § 1226(a) are "paroled into the United States" for purposes of adjustment of status under § 1255(a) is a question of first impression.

## A.   Source of Parole Authority

Ortega-Cervantes contends that he was paroled into the United States pursuant to § 1182(d)(5)(A) rather than conditionally paroled pursuant to § 1226(a). We disagree. After

border patrol agents apprehended Ortega-Cervantes on June 8, 2002, the INS issued a warrant for his arrest. The warrant stated that Ortega-Cervantes "is within the country in violation of the immigration laws and is therefore liable to be taken into custody as authorized by section 236 of the Immigration and Nationality Act [8 U.S.C. § 1226]." Along with the warrant, the INS also issued a Notice of Custody Determination. It stated that, "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act [8 U.S.C. § 1226]," Ortega-Cervantes would be "detained in the custody of this Service" pending the final resolution of his case, *see* 8 U.S.C. § 1226(a)(1), rather than "released under bond," *see id.* § 1226(a)(2)(A), or "released on [his] own recognizance," *see id.* § 1226(a)(2)(B).

**[1]** When the INS redetermined Ortega-Cervantes's custody status on June 20, 2002, it issued a form entitled "Order of Release on Recognizance." The form declared that, "[i]n accordance with section 236 of the Immigration and Nationality Act [8 U.S.C. § 1226] . . . , you are being released on your own recognizance provided you comply with the following conditions." Those conditions included reporting back to the INS "[a]t the conclusion of the criminal proceedings in which you are a witness." It is apparent that the INS used the phrase "release on recognizance" as another name for "conditional parole" under § 1226(a). None of the forms issued to Ortega-Cervantes makes any reference whatsoever to "parole into the United States" under § 1182(d)(5)(A), and immigration officials did not issue Ortega Cervantes an I-94 card, which is typically given to § 1182(d)(5)(A) parolees.

**[2]** Ortega-Cervantes claims that his conditional parole should nevertheless be considered a "parole into the United States" within the meaning of § 1182(d)(5)(A) because the reason for his parole was to permit him to serve as a witness in the criminal prosecution of his smuggler. Ortega-Cervantes points out that one of the regulations issued under § 1182(d)(5)(A) states that parole into the United States may

be granted to "[a]liens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States." 8 C.F.R. § 212.5(b)(4). The problem for Ortega-Cervantes is that this regulation applies only to aliens "who have been or are detained in accordance with § 235.3(b) or (c) of this chapter." *Id.* § 212.5(b). Subsections 235.3(b) and (c) refer to certain "arriving aliens" and certain other aliens "determined to be inadmissible under [8 U.S.C. § 1182(a)(6)(C) or (7)]." 8 C.F.R. § 235.3(b)(1), (c). Ortega-Cervantes is not one of these aliens. He is not an "arriving alien" within the meaning of the regulations because he was apprehended inside the United States after crossing the border illegally. *See* 8 C.F.R. § 1001.1(q) (defining "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry"). Nor is he an alien who was classified as inadmissible under 8 U.S.C. § 1182(a)(6)(C) or (7); instead, he was charged with being removable under 8 U.S.C. § 1182(a)(6)(A)(i), which applies to aliens who are "present in the United States without being admitted or paroled, or who arrive[ ] in the United States at any time or place other than as designated by the Attorney General."

**[3]** We therefore hold that Ortega-Cervantes was conditionally paroled under the authority of § 1226(a) rather than paroled into the United States under the authority of § 1182(d)(5)(A). We do not hold that the government may never grant "parole into the United States" under § 1182(d)(5)(A) to aliens who are currently present in the United States but who were not inspected upon arrival at a port of entry. Although the regulations issued pursuant to § 1182(d)(5)(A) principally authorize parole into the United States for certain arriving aliens, they do not expressly prohibit the government from paroling other aliens "into the

United States . . . for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see* 8 C.F.R. § 212.5. We see nothing that would preclude the government from paroling such an alien into the United States under § 1182(d)(5)(A), rather than conditionally paroling the alien under § 1226(a), so long as the government makes its intention clear, for example, by expressly referencing § 1182(d)(5)(A) and by issuing an I-94 card. *See* INS, General Counsel's Office, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998) (concluding that "the Service may, in the exercise of discretion," parole unlawful entrants pursuant to § 1182(d)(5)(A) "if . . . that parole would serve urgent humanitarian reasons or yield a significant public benefit"). But in this case we see no indication that the government intended to parole Ortega-Cervantes into the United States pursuant to § 1182(d)(5)(A).

## B.   Conditional Parole and Adjustment of Status

Having determined that Ortega-Cervantes was conditionally paroled under § 1226(a) rather than paroled into the United States under § 1182(d)(5)(A), we must next decide whether conditional parolees under § 1226(a) are "paroled into the United States" within the meaning of § 1255(a) and thus eligible for adjustment of status under that section. We conclude that they are not.

**[4]** We agree with the IJ and BIA that the language of § 1255(a) suggests that adjustment of status is available only to aliens who are "paroled into the United States" pursuant to § 1182(d)(5)(A) and not to aliens who are "conditional[ly] parole[d]" pursuant to § 1226(a). However, the statute and its accompanying regulations do not expressly exclude § 1226(a) conditional parolees from eligibility for adjustment of status. We therefore consider whether the legislative history and purpose of these provisions support the agency's interpretation.

As originally enacted in 1952, § 1255(a) did not authorize adjustment of status for any parolees. Instead, it provided that

the Attorney General could adjust "[t]he status of an alien who was lawfully admitted to the United States as a bona fide nonimmigrant and who is continuing to maintain that status." Immigration and Nationality Act, Pub. L. No. 414, § 245(a), 66 Stat. 163, 217 (1952). Congress added the "parole" language to § 1255(a) in 1960 as part of a joint resolution authorizing the parole of certain refugees into the United States. As revised, § 1255(a) provided that "[t]he status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General." H.R.J. Res. 397, 86th Cong., Pub. L. No. 86-648, § 10, 74 Stat. 504, 505 (1960). According to the accompanying Senate Report,

> The principal purpose of the Joint Resolution . . . is to enable the United States to participate in the resettlement of certain refugee-escapees by granting the Attorney General special authority under the provisions of [§ 1182(d)(5)] to parole into the United States . . . refugees who are under the mandate of the United Nations High Commissioner for Refugees . . . . The resolution also would establish a procedure which is designed to enable any such refugee-escapee admitted in a parole status to obtain an adjustment of his immigration status to that of alien lawfully admitted for permanent residence . . . .
>
> . . . .
>
> In addition, a purpose of the joint resolution is to broaden the existing procedure for the adjustment of the status of a nonimmigrant to that of the status of an alien lawfully admitted for permanent residence to include all aliens (other than crewman) who have been inspected at the time of their entry into the United States or who have been paroled into the United States.

S. Rep. No. 86-1651 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3124, 3124-25. Thus, by amending § 1255(a), Congress sought to ensure that a class of otherwise excludable aliens who were being brought to the United States for humanitarian reasons would have an opportunity to become lawful permanent residents. *See* 106 Cong. Rec. 15389 (1960) (statement of Sen. Keating) (explaining that the legislation "would establish a procedure for allowing refugee-escapees admitted on a parole basis to adjust their immigration status to that of aliens lawfully admitted for permanent residence").

Congress did not intend for the 1960 amendment to benefit aliens already within the United States who had been taken into custody because they were believed to be deportable but who were then released on parole under the precursor to § 1226(a) pending a final decision on their deportation. Parole *into* the United States meant just that. The Senate Report was explicit on this point: "The wording of the amendment is such as not to grant eligibility for adjustment of status . . . to aliens who entered the United States surreptitiously." S. Rep. No. 86-1651 (1960), *supra*, 1960 U.S.C.C.A.N. at 3137.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") raised new questions about who is eligible to adjust status under § 1255(a) as a parolee "into the United States." By shifting the focus of immigration law from "entry" to "admission," and by merging exclusion and deportation proceedings into "removal" proceedings, IIRIRA arguably altered the relationship between conditional parole and adjustment of status. Prior to IIRIRA, aliens "who entered the United States without inspection or at any time or place other than as designated by the Attorney General" would have been subject to deportation. *See* 8 U.S.C. § 1251(a)(1)(B) (1994). Now, under IIRIRA, aliens "present in the United States who ha[ve] not been admitted" and aliens "who arrive[ ] in the United States (whether or not at a designated port of arrival . . .)" are both considered "applicant[s] for admission." 8 U.S.C. § 1225(a)(1); *see also Succar v. Ash-*

*croft*, 394 F.3d 8, 26-27 (1st Cir. 2005). All applicants for admission, whether they are at the border or already physically present inside the country, must "be inspected by immigration officers" who will determine their admissibility. 8 U.S.C. § 1225(a)(3). Aliens who have entered the country without inspection are classified as "inadmissible" under § 1182. *See id.* § 1182(a)(6)(A)(i). Section 1182, of course, is the same provision that allows aliens who might otherwise be deemed inadmissible to be "parole[d] into the United States . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* § 1182(d)(5)(A). Thus, after IIRIRA, one could reasonably argue that any grant of parole, whether formally authorized by § 1182(a)(5)(D) or § 1226(a), necessarily allows an alien "into the United States" while a final decision on the alien's admissibility remains pending.

Indeed, since the passage of IIRIRA, INS memoranda have twice suggested that unlawful entrants paroled pursuant to § 1226(a) might qualify for adjustment of status. First, in a policy memorandum issued in 1998, the INS General Counsel's Office explained that aliens who have entered the United States without inspection are applicants for admission who may be paroled under the authority of § 1182(d)(5)(A), presumably making them eligible for adjustment of status under § 1255(a). INS, General Counsel's Office, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998). The General Counsel's memorandum is consistent with our conclusion in the previous section that there is no per se bar on paroling unlawful entrants into the United States pursuant to § 1182(d)(5)(A). However, the memorandum does not further state that every conditional parole under § 1226(a) necessarily constitutes a "parole into the United States" within the meaning of § 1255(a).

Second, in a 1999 memorandum that relied in part on the General Counsel's 1998 memorandum, the INS Commissioner concluded that Cuban nationals who arrived "at a place other than a port of entry" were eligible for adjustment of sta-

tus under the Cuban Adjustment Act, which uses language similar to § 1255(a). *See* INS Commissioner Meissner, Cuban Adjustment Act Memorandum, Apr. 19, 1999, *available at* http://www.uscis.gov (click on "Laws and Regulations" tab, then on "Immigration Handbooks, Manuals, and Policy Guidance," then on "Adjudicator's Field Manual," and then on Appendix "23-4"). The Commissioner stated that "if the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted," the Service should treat the alien as having been paroled into the United States. *Id.* The Commissioner instructed INS officials to issue Cuban nationals I-94 cards upon request indicating that they were paroled under § 1182(d)(5)(A). *Id.* n.1. Although the Commissioner's memorandum goes somewhat further than the General Counsel's memorandum, it focuses on aliens covered by the Cuban Adjustment Act and does not expressly state that every alien who is conditionally paroled under § 1226(a) necessarily becomes eligible for adjustment of status under § 1255(a).

These memoranda do not convince us that IIRIRA made every alien conditionally paroled under § 1226(a) eligible for adjustment of status. The BIA correctly noted that internal guidance memoranda are not binding authority and "are entitled to respect . . . only to the extent that [they] have the power to persuade." *Acosta v. Gonzales*, 439 F.3d 550, 554 (9th Cir. 2006) (internal quotation marks omitted). Like the IJ and BIA, we are unconvinced that IIRIRA made every "conditional parole" under § 1226(a) equivalent to a "parole into the United States" under § 1182(d)(5)(A), thus enabling conditional parolees to adjust their status under § 1255(a). Even after IIRIRA, the parole provisions of § 1182(d)(5)(A) and § 1226(a) continue to serve distinct purposes.

Section 1182(d)(5)(A) allows deserving aliens who might not otherwise be admissible to come "into the United States" on a temporary basis. The scope of § 1182(d)(5)(A) is carefully circumscribed: Aliens may be paroled into the United

States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The provision focuses principally on aliens who arrive and present themselves to immigration officials at a designated port of entry. *See* 8 C.F.R. § 212.5.

By contrast, § 1226(a) focuses principally on aliens who are present in the United States but were not lawfully admitted or who were lawfully admitted but have become subject to removal. Section 1226(a) simply provides that, when an alien is "arrested and detained," immigration officials have the option of releasing the alien from custody on bond or conditional parole pending a final removal decision. The provision does not restrict conditional parole to cases involving "urgent humanitarian reasons or significant public benefit." *Cf. Reno v. Flores*, 507 U.S. 292, 294-95 (1993) ("Congress has given the Attorney General broad discretion to determine whether, and on what terms, an alien arrested on suspicion of being deportable should be released pending the deportation hearing.").

**[5]** In enacting IIRIRA, Congress did not express any intention to allow conditional parolees to adjust status as aliens "paroled into the United States." To the contrary, Congress expressed concern that the Attorney General had been using parole "to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories." H.R. Rep. No. 104-469, pt. 1, at 141 (1996). Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for "parole into the United States" under § 1182(d)(5)(A) and thus become eligible for adjustment of status. That Congress did not similarly limit the Attorney General's discretion under § 1226(a) strongly suggests that Congress did not view "conditional parole" as the equivalent of "parole into the United States" under § 1182(d)(5)(A) and thus as a path to lawful permanent residence under § 1255(a).

**[6]** Further evidence that adjustment of status is not generally available to unlawful entrants who are conditionally paroled under § 1226(a) appears at 8 U.S.C. § 1255(i). That provision, which was added to § 1255 in 1994, expressly permits certain unlawful entrants to adjust status. *See* 8 U.S.C. § 1255(i) (1994 & Supp. 1996) ("Notwithstanding the provisions of subsections (a) and (c) of this section, an alien physically present in the United States . . . who . . . entered the United States without inspection . . . may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence."). Section 1255(i) was initially scheduled to sunset in 1997, but that date was subsequently extended to 1998 and then to 2001. *See* Pub. L. No. 105-119, § 111, 111 Stat. 2440, 2458 (1997); Pub. L. No. 106-554, § 1502, 114 Stat. 2763, 2763A-324 (2000). In its current form, § 1255(i) allows adjustment of status only for unlawful entrants who were physically present in the United States on December 21, 2000, and who filed petitions for classification or labor certifications on or before April 30, 2001. 8 U.S.C. § 1255(i)(1)(B), (C). Given that § 1255(i) permits unlawful entrants to adjust their status only under certain specified conditions, it would be odd to read § 1255(a) to authorize unlawful entrants who do not meet those conditions to seek adjustment of status whenever they are conditionally paroled pursuant to § 1226(a).

Ortega-Cervantes makes the additional argument that, although he is currently in removal proceedings, 8 C.F.R. § 245.1(c)(8) does not preclude him from adjusting his status if he is otherwise eligible to do so. In *Bona v. Gonzales*, 425 F.3d 663 (9th Cir. 2005), we held that § 245.1(c)(8), which barred aliens in removal proceedings from seeking adjustment of status, was invalid. The regulation has since been withdrawn. *See* 71 Fed. Reg. 27585, 27587 (May 12, 2006). However, § 245.1(c)(8) is not relevant to this case. First, contrary to Ortega-Cervantes's assertions, neither the IJ nor BIA relied upon, or even mentioned, § 245.1(c)(8). Second, because Ortega-Cervantes's conditional parole does not constitute

parole into the United States under § 1255(a), he is not otherwise eligible for adjustment of status.

## Conclusion

**[7]** For the foregoing reasons, we hold that Ortega-Cervantes was not paroled into the United States under § 1182(d)(5)(A). We also hold that Ortega-Cervantes did not become eligible for adjustment of status under § 1255(a) by virtue of his conditional parole under § 1226(a).

Petition for Review DENIED.