**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JORGE RAUL GARCIA,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney General,

*Respondent.*

No. 08-73004

Agency No.
A072-897-225

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
August 30, 2011—Pasadena, California

Filed November 2, 2011

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Richard Seeborg, District Judge.*

Opinion by Judge Gould

*The Honorable Richard Seeborg, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

Kristen Jackson, Public Counsel Law Center, Los Angeles, California, for the petitioner-appellant.

David H. Wetmore and Robbin Kinmonth Blaya, Office of Immigration Litigation, Washington, D.C., for the respondent-appellee.

## OPINION

GOULD, Circuit Judge:

Jorge Raul Garcia ("Garcia") petitions for review of the Board of Immigration Appeals's ("BIA") dismissal of his appeal of an Immigration Judge's ("IJ") decision denying his application for cancellation of removal. The BIA concluded that Garcia's 1992 parole as a Special Immigrant Juvenile, under 8 U.S.C. § 1255(h), did not qualify as an admission "in any status" as required by 8 U.S.C. § 1229b(a)(2) and, as a result, found Garcia statutorily ineligible for cancellation of removal because he did not establish seven years of continuous physical presence after having been "admitted in any status." We disagree and hold that parole as a Special Immigrant Juvenile, under 8 U.S.C. § 1255(h), qualifies as an admission "in any status" for the purposes of 8 U.S.C. § 1229b(a)(2). We grant Garcia's petition and remand to the BIA for further proceedings consistent with our opinion.

## I

## A

Garcia was born in Mexico in 1984 to Mexican citizen parents. Garcia had a difficult and tragic childhood in Mexico. His father was incarcerated for murdering his mother, and in

his youth Garcia suffered a closed head injury, a type of traumatic brain injury. Garcia entered the United States without inspection in 1992 and soon thereafter entered the foster care system in California. His long-term social worker described him as "respectful" and "good hearted." Garcia was diagnosed with bi-polar disorder while in foster care. He went to special education classes in school. He has been diagnosed with diabetes and assessed as having "low-average" intelligence. Garcia was emancipated from the foster care system in 2004 at the age of 20. He has a U.S. citizen child.

In April 1993, when Garcia was nine years old, the Los Angeles County Department of Children and Family Services ("DCFS") filed a petition with the state juvenile dependency court on behalf of Garcia because of allegations of severe physical abuse. On July 15, 1994, the court found Garcia a dependant child of the court, eligible for long-term foster care. The court also found "that it would not be in the best interests of the minor to be returned to his/her country of citizenship or the country of habitual residence of his/her parents." The court ordered that the DCFS "make the necessary application for special immigrant status as a permanent resident for [Garcia]."[1] That month, DCFS's Special Immigrant Status Unit filed an immigration application on Garcia's behalf. The application included, inter alia, an I-360 Petition for classification as a special immigrant and an I-485 Application for adjustment to permanent resident status, based on Garcia's being an undocumented foster child/Special Immigrant Juvenile.

---

[1]Under 8 U.S.C. § 1101(a)(27)(J), an immigrant is eligible for Special Immigrant Juvenile Status if: (i) he has been declared dependent on a juvenile court and has been deemed eligible for long-term foster care due to abuse, neglect, or abandonment; (ii) it has been determined in administrative or judicial proceedings that it would not be in the child's best interest to be returned to his country of nationality or residence; and (iii) the Secretary of Homeland Security expressly consents to the dependency order serving as a precondition to the grant of special immigrant status. Garcia was eligible for the Special Immigrant Juvenile Status.

On February 28, 2000, the immigration authorities approved Garcia's I-360 Petition and I-485 Application and gave him Legal Permanent Resident ("LPR") status. It took more than five years for Garcia's LPR status to be approved. A likely source for that delay may have been his missing birth certificate which was added to Garcia's file in April 1999. Garcia's I-181 Memorandum of Creation of Record of Lawful Permanent Residence, reflecting his approval for LPR status, lists "92" in the field "Year Adm[itted] to U.S. or Year of Change to present [Non-Immigrant] Class."

**B**

Garcia was arrested on November 13, 2005, for stealing a bicycle in Long Beach, California. The city prosecutor charged him with a misdemeanor for grand theft of property worth over $400, to which Garcia pleaded *nolo contendere*. *See* Cal. Penal Code § 487(a) (2005). Garcia was found guilty and received a suspended sentence of three years of summary probation and twenty days in county jail. On December 28, 2005, Garcia was arrested for shoplifting from a Target store in Manhattan Beach, California. Garcia was charged with petty theft with prior convictions, and with giving false information to a police officer. *See* Cal. Penal Code §§ 666, 148.9(a) (2005). He pleaded guilty to the theft charge, for which he received a suspended sentence of three years of formal probation and almost one year in county jail. The false information charge was dismissed.

Relying on these two convictions, in October 2006, the Department of Homeland Security ("DHS") issued a Notice to Appear ("NTA") charging that Garcia was removable, pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii), for having, after admission, been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct. Garcia admitted to the allegations in the NTA, conceded removability, and sought cancellation of removal.

An LPR is eligible for cancellation of removal if: (1) he has been "lawfully admitted for permanent residence for not less than 5 years"; (2) he "has resided in the United States continuously for 7 years after having been admitted in any status"; and (3) he "has not been convicted of any aggravated felony." 8 U.S.C. § 1229b(a). DHS opposed cancellation of removal on the ground that Garcia lacked the required seven years of continuous residence. Under the government's interpretation, the seven-year period ran from when Garcia received LPR status in 2000. Nearly six years had lapsed between when the California juvenile dependency court ordered DCFS's Special Immigrant Status Unit to file an immigration petition for Garcia in 1994, and when immigration authorities ultimately approved the petition. The government's interpretation did not credit any of that lapsed time, leaving Garcia narrowly short of the required seven years when he was convicted for the second theft offense in January 2006.

Garcia argued that he met the seven-year duration requirement on two separate grounds. First, Garcia contended that, under § 1255(h), he was deemed paroled into the United States—which counted as an admission "in any status" under § 1229b(a)(2)—upon the filing of his Special Immigrant Juvenile Status ("SIJS")-based immigration application in 1994, more than seven years before his second conviction. Second, he contended that his "admission" for permanent resident status could be imputed as of the date on which he became a ward of the State of California, his legal guardian, in the same way that such admission is imputed from a parent under *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1029 (9th Cir. 2005) (holding that "for purposes of satisfying the seven-years of continuous residence 'after having been admitted in any status' required for cancellation of removal under 8 U.S.C. § 1229b(a), a parent's admission for permanent resident status is imputed to the parent's unemancipated minor children residing with the parent"). The IJ rejected these arguments and denied cancellation of removal solely on the basis

that Garcia did not have the required seven years of continuous residence.

The BIA affirmed. It reasoned that § 1255(h) provided that a Special Immigrant Juvenile is deemed to have been "paroled" into the United States for the purpose of adjustment of status, but that, under the plain language of § 1255(a), which permits the Attorney General to adjust the status of individuals who have been "inspected and admitted or paroled," being "paroled" into the United States is not the same as being "admitted." It also declined to extend the holding of our precedent in *Cuevas-Gaspar* to cover the legal guardianship between the State and its ward, concluding that such a relationship is materially distinguishable from that between parents and children. The BIA dismissed Garcia's appeal, and Garcia was removed to Mexico. Garcia petitions for a review of the BIA's decision.

## II

The issues on review are (1) whether Garcia's SIJS-based parole for adjustment of status under § 1255(h) constitutes an admission "in any status" for purposes of eligibility for cancellation of removal under § 1229b(a)(2), and (2) whether Garcia should be imputed lawful admission from his legal guardian, the State of California. We "review de novo the BIA's determination of questions of law, except to the extent that deference is owed to its interpretation of the governing statutes and regulations."[2] *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011 (9th Cir. 2006).

---

[2]The Government incorrectly states that the BIA's conclusion that Garcia did not establish the necessary seven years of continuous residence is a factual finding reviewed for substantial evidence. As Garcia correctly suggests in his reply brief, there are no disputed facts to be reviewed for substantial evidence; only the legal significance of the undisputed facts is at issue.

Where the statute is unambiguous and congressional intent is clear "both the court and the agency must give effect to the unambiguously expressed intent of Congress." *Id.* at 1012 (quoting *Chevron U.S.A. Inc. v. Natural Resources Def. Council*, 467 U.S. 837, 843-44 (1984) (internal quotation marks omitted)). Where congressional intent is unclear, a reviewing court must give deference to an agency's statutory interpretation provided it is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. "*Chevron* deference, however, does not apply to all statutory interpretations issued by agencies." *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 921 (9th Cir. 2006). An agency's statutory interpretation only "qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

"It is well-established that Congress delegated to the BIA the authority to promulgate rules, on behalf of the Attorney General, that carry the force of law 'through a process of case-by-case adjudication.' " *Garcia-Quintero*, 455 F.3d at 1012 (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)). We give *Chevron* deference to BIA decisions that are issued under a "lawmaking pretense," a term borrowed from the Supreme Court's decision in *Mead*, 533 U.S. at 233, capable of binding third parties. *Garcia-Quintero*, 455 F.3d at 1012 (citing *Miranda Alvarado*, 449 F.3d at 922). We have previously held, however, that BIA "interpretations promulgated in a non-precedential manner" do not carry the force of law and are not subject to *Chevron* deference. *Id.* at 1012. Because the BIA's decision under review here is a single-member unpublished decision, we do not give it *Chevron* deference because the "authority to make rules with force of law . . . was not invoked." *Mead*, 533 U.S. at 237; *see also Garcia-Quintero*, 455 F.3d at 1013 (quoting 8 C.F.R. § 1003.1(g) for the proposition that "only 'selected decisions

of the [BIA] rendered by a three-member panel or by the [BIA] en banc may be designated to serve as precedents' ").
Stated another way, if the BIA wants its decisions to be given *Chevron* deference, it must decide with a three-judge panel or en banc. An unpublished decision of a single board member is not entitled to *Chevron* deference.

But that does not end our consideration of whether deference to the BIA's decision is appropriate here. For even when *Chevron* deference is unwarranted because of the nature of the decision, we may accord deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Mead*, 533 U.S. at 237. Pursuant to *Skidmore*, a reviewing court "may properly resort" to an agency's interpretations and opinions "for guidance," as they constitute "a body of experience and informed judgment." *Skidmore*, 323 U.S. at 140. "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* Where the BIA's decision does not give thorough reasoning, but instead is conclusory or lacks meaningful analysis, we give that decision only limited deference. *See Guevara v. Holder*, 649 F.3d 1086, 1091 (9th Cir. 2011); *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1101 n.4 (9th Cir. 2011).

With these principles in mind, we consider the BIA's conclusion that parole as a Special Immigrant Juvenile under § 1255(h) does not qualify as an admission "in any status" for the purposes of eligibility for cancellation of removal under § 1229b(a).

## III

### A

The BIA dismissed Garcia's appeal on the basis that (1) under the plain language of the Immigration and Nationality

Act, being "paroled" into the United States is not the same as being "admitted," and that (2) Garcia had not otherwise persuaded it that his initial parole into the United States qualified as an admission. This analysis was conclusory and did not take into account that both we and the BIA have construed "admitted in any status" as being broader than the statutorily-defined term "admitted." Nor did the BIA engage in a meaningful analysis to support its conclusion that SIJS-parolees are not admitted for the purposes of § 1229b(a)(2). Given its summary nature, the BIA's analysis does not merit significant deference. *See Vasquez de Alcantar*, 645 F.3d at 1101 n.4 ("We afford little deference under *Skidmore* to the BIA's analysis in the present case, because it did not provide thorough reasoning and is conclusory."). We next address what we consider to be the controlling legal principles.

## B

**[1]** The phrase "admitted in any status" is not defined in the Immigration and Nationality Act ("INA"). The INA does, however, define "admission" and "admitted" to mean "the lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). "This definition is clear and unambiguous . . . [and] we need not defer to the BIA with regard to the meaning of this term." *Vasquez de Alcantar*, 645 F.3d at 1100. There is no dispute here that Garcia was not admitted within the meaning of § 1101(a)(13)(A). *See* 645 F.3d at 1101.

**[2]** We have previously concluded, however, that "there are instances where an alien is 'admitted,' for the purposes of § 1229b(a)(2), without having been inspected and authorized to enter the United States at the border." *Garcia-Quintero*, 455 F.3d at 1016; *see also Matter of Rosas-Ramirez*, 22 I. & N. Dec. 616, 618 (BIA 1999) (declining to find "that reference to the definition of 'admission' and 'admitted' in [§ 1101](a)(13)(A) adequately answers the question of the

intended scope of the term 'admission' in section 237(a)(2)(A)(iii)"). "[T]he clause 'in any status' has been interpreted to create alternative methods for aliens, who do not enter after inspection and authorization, to meet the 'admitted in any status' requirement of § 1229b(a)(2)." *Vasquez de Alcantar*, 645 F.3d at 1100 (citing *Cuevas-Gaspar,* 430 F.3d at 1029); *see also, e.g.*, *Garcia-Quintero*, 455 F.3d at 1009 (holding that Garcia-Quintero's "acceptance into the Family Unity Program render[ed] him 'admitted in any status' for the purposes of cancellation of removal"). This brings us to the dispositive issue: We must decide whether SIJS-parolees may be considered as having been "admitted in any status" within the meaning of § 1229b(a)(2). If so, then Garcia's tenure of continuous residency is sufficient for eligibility to be considered for cancellation of removal. If not, then he is statutorily out of luck and without possible recourse to cancellation of removal.

## 1

The Government argues that SIJS-parolees are not "admitted in any status" under § 1229b(a)(2) because the plain language of the INA shows that parole is different from admission. The government points to the language of § 1101(a)(13)(B), which provides that "[a]n alien who is paroled under [§ 1182(d)(5)[3]] . . . shall not be considered to

---

[3]This section states:

(A) The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled

have been admitted," to support its argument that no parolee may qualify as being "admitted in any status."

The government's position is correct to a degree, but is not persuasive because it does not take into account all of the pertinent statutory language. Garcia was "deemed . . . to have been paroled" under § 1255(h)(1), not paroled under § 1182(d)(5). Circuit and BIA precedent establish that, in the immigration context, not all paroles are treated equally. The definition, scope, and the consequences of parole may vary based on the wording and placement of a particular statutory provision. *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007) (holding that "conditional parolees" under § 1226(a) are not "paroled into the United States" within the meaning of § 1182(d)(5)(A)); *Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 258 (BIA 2010) (holding that "conditional parole" under § 1226(a)(2)(B) is a "distinct and different procedure" from "parole" under § 1182(d)(5)(A)).

**[3]** Parole under § 1255(h)(1) is different from parole under § 1182(d)(5). The plain language of § 1255(h) does not indicate that SIJS-parolees shall be considered paroled under § 1182(d)(5), nor that SIJS-parolees shall receive a parole card pursuant to § 1182(d)(5), as required by regulation. 8 C.F.R. § 235.1(h)(2); *see Ortega-Cervantes*, 501 F.3d at 1116 (finding "no indication that the government intended to parole Ortega-Cervantes into the United States pursuant to § 1182(d)(5)(A)" where the government did not "make[ ] its

_____

and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

intention clear, for example, by expressly referencing § 1182(d)(5)(A) and by issuing an I-94 card."). That the INA provides that those paroled under § 1182(d)(5) "shall not be considered to have been admitted," then, does not speak clearly, if at all, to whether Garcia as a SIJS-parolee may be considered to have been "admitted in any status" under § 1229b(a).

**[4]** Congress did not include SIJS-parolees in its express preclusion of § 1182(d)(5) parolees from admission eligibility. Under the doctrine of *expressio unius est exclusio alterius*, the statute's express preclusion of parolees under § 1182(d)(5) from admission, while remaining silent on the admission status of other parolees, could indicate that Congress intended not to preclude non-specified parolees from being considered to be admitted. *See Washington v. Chu*, 558 F.3d 1036, 1044 (9th Cir. 2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Beach v. Fed. Bank*, 523 U.S. 410, 418-19 (1998) (internal quotation marks omitted) (emphasis omitted))). In this light, the precedents provided by the Government to show that parolees are more widely barred from being considered to have been admitted are unpersuasive because they stem from cases specifically involving parole under § 1182(d)(5) or from former phrases within the immigration code; none of them explicitly discusses SIJS-based parole, and so none is very helpful on the issue presented to us.

**[5]** We conclude then that SIJS-based parolees are not expressly barred by Congress from being considered to have been "admitted in any status," and we next examine whether SIJS-based parole qualifies as one of the "alternative methods for aliens . . . to meet the 'admitted in any status' requirement" for cancellation of removal. *Vasquez de Alcantar*, 645 F.3d at 1101.

**2**

Garcia contends that his SIJS-based parole is soundly analogous to the DHS action in *Garcia-Quintero* that we held conferred admission "in any status" for the purposes of cancellation of removal. He contends that case law and legislative purpose support a conclusion that his SIJS-based parole was also an admission "in any status."

**[6]** In *Garcia-Quintero*, we concluded that Garcia-Quintero's acceptance into the Family Unity Program ("FUP") rendered him "admitted in any status" for purposes of eligibility for cancellation of removal under § 1229b(a)(2). 455 F.3d at 1009. We reasoned that acceptance into the program gave unique benefits for a narrow group of aliens, including protection from deportation and authorization to work, and was "designed to help families stay together while the beneficiaries adjust to LPR status." *Id.* at 1009-10. Evaluating extant BIA precedent on the meaning of "in any status," we there concluded that the "limited benefits and protections" of the FUP gave its beneficiaries a status. *Id.* at 1018. We took note that the section of the FUP regulations governing travel outside of the United States included the terms "status" and "admitted." *Id.*

Since then we have twice considered aliens' requests to extend the holding of *Garcia-Quintero* to other situations, and our opinions declining to do so have refined the criteria necessary to conclude that a DHS action creates an alternative method for an alien to meet the "admitted in any status" requirement. In *Vasquez de Alcantar*, we held that neither the filing nor the approval of an alien's Form I-130 Petition for Alien Relative, which allows him to apply for adjustment of status, creates an alternative method of admission. 645 F.3d at 1102. We also rejected the analogy between I-130 petitions and acceptance into the FUP. *Id.* at 1103-4. We stressed, first, that FUP beneficiaries are distinct from I-130 visa petition beneficiaries because FUP participants "are provided congres-

sionally mandated benefits," including protection from deportation and employment authorization, and "must meet additional requirements for eligibility." *Id.* at 1104. We observed, second, that the FUP had exclusions from eligibility inapplicable to I-130 beneficiaries. *Id.* at 1105. We noted, third, that the FUP regulations gave beneficiaries under the program an "immigration status" by authorizing travel outside the United States, whereas "admission status connected to advanced parole for other adjustment of status applicants is specifically precluded by 8 U.S.C. § 1182(d)(5)(A)." *Id.* Fourth, we considered it relevant that Congress had clarified the extra protection afforded to FUP beneficiaries in subsequent statutory enactments. *Id.* at 1106. Based on these factors, we concluded that, by enacting the FUP, Congress "provided mandatory protections and benefits to a distinct group of aliens while they await adjustment of status." *Id.* However, the case law, statutes, and regulations governing Form I-130 petitioners "d[id] not support a holding that beneficiaries of approved I-130 visa petitions should be given admission status." *Id.*

In an opinion filed the same day as *Vasquez de Alcantar*, we similarly concluded that employment authorization does not create an alternative method for an alien to meet the "admitted in any status" requirement. *Guevara*, 649 F.3d at 1094. In so holding, we reasoned that "the FUP was enacted by Congress to assist a very narrow group of aliens" and set forth heightened eligibility requirements. *Id.* at 1093. We noted that the program's purpose was "to prevent the separation of families and to provide a means by which a qualifying family member . . . could eventually apply for permanent residence status." *Id.* We clarified that *Garcia-Quintero* "was not based upon the fact that FUP participants were allowed to work . . . [but] instead focused on the aliens' *acceptance* into the FUP." *Id.* at 1093-94. Employment authorization was more provisional for Guevara than for FUP participants. Guevara received authorization pending his application for adjustment of status. *See* 8 C.F.R. § 274a.12(c)(9). Unlike other provi-

sions conferring authorization incident to preexisting status, § 274a.12(c) applies to aliens who "may or may not have any legal status." 649 F.3d at 1092. Employment authorization for aliens in that residual category could be "terminated or revoked at any time" for certain reasons. *Id*. We concluded that there was no support "for concluding that Congress intended to make a whole class of aliens (not inspected or authorized) 'admitted' by the mere grant of an employment authorization." *Id.*

**[7]** Under the principles established in *Garcia-Quintero* and the cases that have followed it, we perceive that SIJS-based parolees are similarly situated to FUP participants and qualify as having been "admitted in any status." As is the case for FUP participants, SIJS-parolees are a narrow class of juvenile aliens who must meet heightened eligibility requirements to apply to be classified as a Special Immigrant Juvenile, and SIJS-based parole affords particular benefits. To qualify for SIJS, an alien must be declared to be a court dependant eligible for long-term foster care due to abuse, neglect, or abandonment, and a judge or administrative body must find that it is not in the juvenile's best interest to return to his country of nationality. § 1101(a)(27)(J). The Secretary of Homeland Security must also consent to the grant of SIJS. *Id*. Like FUP beneficiaries, SIJS-based parolees gain special benefits set by Congress. These include the permission to remain in the country pending the outcome of their adjustment of status application, employment authorization, exemption from certain inadmissibility grounds applicable to other aliens, and, under amendments made after Garcia's LPR application was processed, expeditious adjudication of their LPR application. *See* Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 302, 105 Stat. 1733, 1744-45 (codified at § 1255(h)(2)(B)) (waiving certain admissibility requirements); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 235(d)(1)-(3), 122 Stat. 5044, 5079-80 (codified at §§ 1101, 1255) (providing, inter alia, that the DHS must adju-

dicate SIJS applications "not later than 180 days after the date on which the application is filed").

**[8]** These special eligibility requirements and benefits show a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status. Such an intent, while not identical to that involved in *Garcia-Quintero*, is analogous to Congress's goal, in enacting the FUP, of "prevent[ing] the separation of families and [providing] a means by which a qualifying family member . . . c[an] eventually apply for permanent residence status." *Guevara*, 649 F.3d at 1093 (discussing rationale behind *Garcia-Quintero*'s holding). A Special Immigrant Juvenile like Garcia does not have the same family to be kept together that was involved in *Garcia-Quintero*, because the state and foster homes are his family. But he was given similar special recognition and opportunity to make contacts in this country, and for that reason should not be wrenched away without adequate process. That Congress has subsequently mandated expeditious adjudication of SIJS applications may be viewed as a clarification by Congress that it does in fact desire extra protection for SIJS-eligible minors. The *Vasquez de Alcantar* court noted that similar subsequent statutory enactments to the FUP were relevant to the holding in *Garcia-Quintero*. 645 F.3d at 1106.

Congress's extension of certain protections to FUP participants and SIJS parolees gives those narrow groups of aliens strong claims to remain in this country. Our decisions in *Vasquez de Alcantar* and *Garcia* emphasized that the much broader groups of aliens who have filed I-130 petitions or sought employment authorization are entitled only to a chance to seek admission. Those groups have much weaker claims to remain in this country. An I-130 petitioner seeks admission and legal status, but is not entitled to it. Even an approved I-130 petition is only an intermediate and contingent step toward admission. *See Vasquez de Alcantar*, 645 F.3d at 1103 (citing *Unites States v. Elrawy*, 448 F.3d 309, 313-14 (9th Cir.

2006); *Ngongo v. Ashcroft*, 397 F.3d 821, 823 (9th Cir. 2005)). Aliens seeking employment authorization under 8 C.F.R. § 274a.12(c) pending adjustment of status enjoy similarly provisional benefits. Immigration authorities have discretion to grant or deny authorization, and may revoke an earlier authorization for certain reasons not applicable here. *See Guevara*, 649 F.3d at 1092 (citations omitted). Congress's decision to permit certain undocumented aliens to seek adjustment of status "only confers the right to apply." *Id*. at 1093. For these groups of aliens, the completion of an intermediate step toward admission does not render them "admitted in any status."

Subtle differences between the FUP and SIJS regulations do not undermine our conclusion that SIJS-based parole is an alternative method of admission. Our decision in *Garcia-Quintero* had found it important that the FUP regulations governing travel outside the United States used the terms "status" and "admitted" together. 455 F.3d at 1018. The regulations, which permitted an FUP beneficiary to be readmitted with the same status upon re-entry after travel abroad, confirmed our conclusion that "acceptance into the FUP confers some type of immigration status." *Id*.; *see* 8 C.F.R. § 236.16. The regulations and provisions governing SIJS-based parole, by contrast, do not mention "status" and "admission" together. *See* 8 C.F.R. § 204.11 (referring only to "special immigrant status" and "special immigrant juvenile status").

It is not surprising that the SIJS regulations do not mention admission, as the FUP regulations do. The FUP regulations permit beneficiaries to travel abroad without penalty, although they must seek prior authorization. That policy furthers the FUP's goal of keeping families together in this country, while allowing them to maintain ties to familial and social networks in their countries of origin. By contrast, SIJS-based parolees' claims to remain in this country derive from their status as juvenile dependants of the court and their lack of viable family ties. *Cf*. 8 C.F.R. § 204.11(a). Such parolees are unlikely

to have occasion to travel abroad while their applications are pending and they remain dependants of the court. There would be no need for regulations governing the status they would enjoy upon re-entry after travel abroad. While we found the FUP regulations' text persuasive in reaching our holding in *Garcia-Quintero*, we did not think it as materially significant as statutory text, legislative intent, and case law. *See* 455 F.3d at 1018-19. The absence of analogous provisions in the SIJS regulations does not persuade us that Congress intended to deny SIJS-based parolees eligibility for cancellation of removal.

**[9]** Because SIJS-based parole is analogous to one of the "alternative methods for aliens . . . to meet the 'admitted in any status' requirement" for cancellation of removal, we hold that the grant of SIJS-based parole qualifies as an admission "in any status" for cancellation of removal purposes. *See Vasquez de Alcantar*, 645 F.3d at 1100. On this basis Garcia has accrued the required seven years of continuous presence after being "admitted in any status," and he is eligible for cancellation of removal.[4] We grant the petition for review and remand to the BIA for further proceedings consistent with this opinion.

**PETITION GRANTED.**

---

[4]Because we conclude that Garcia was, upon his designation as a SIJS-parolee, "admitted in any status" for the purposes of § 1229b(a)(2), we need not and do not reach the question of whether under *Cuevas-Gaspar* Garcia should be imputed lawful admission from his legal guardian, the State of California.